Good morning, Your Honors. May it please the Court, my name is Neil Levine. I'm attorney for the appellants, plaintiffs in this case, where we seek to overturn the Fish and Wildlife Service decision to withdraw the proposed rule to list the flat-tailed horned lizard under the Endangered Species Act. And specifically, we challenge the various conclusions and findings that the agency has offered up to support their changed position from the proposed rule to the two withdrawals. And our arguments are based on, we have sort of three primary arguments. One is that the agency's review of the lizard's lost habitat range violated the Endangered Species Act in the 2006 withdrawal. The second is that their analysis and conclusions regarding threats to the species in its remaining range in the 2003 rule was arbitrary and capricious and unsupported. And third, there was never a collective or cumulative assessment of lost range and threats, and the various threats were analyzed sort of as individual pinpricks or paper cuts and never cumulatively analyzed. So I'm going to start first with the assessment of the lost range. And the agency's analysis of lost range in the 2006 rule was predicated on a conclusion that the species is persisting in its remaining range. And we have offered in our briefs that this Court's prior decision regarding this species in the 2001 decision, defenders, said the agency cannot review the species' status under the significant portion of range listing factor by saying it's viable or persistent in the areas that it's doing different, though. Because there we looked at the species from a private versus public land perspective. And the Court said the agency acknowledged that private lands are gone or threatened. And the fact that you're relying on public lands to sustain the species is inadequate to apply that listing. And I'm having trouble understanding exactly where your argument goes. As I understand what happens in 2006 after remand from the District Court, the agency says, well, we're looking at the historic range, which included the area around, for example, the Salton Sea, and we recognize that some of the historic range has disappeared. But we don't think it's substantial within the meaning of the statute and within the meaning of the defender's decision because it has, quote, persisted. Are you challenging their decision that it's persisted? You're just saying there's just not enough evidence that, in fact, it's persisted in the remaining range? I'm having trouble getting my hands on precisely what your argument is. Okay. We have two arguments on this. First is more of a legal argument, that you cannot, as a matter of law, rely on species' persistence or viability in here, the current range. Even if the current range is very large? I suppose regardless. So I'll accept that assumption. Okay. All right. Because that means, essentially, you are conflating those two listing standards, significant portion and throughout all, because the only way you're going to list a species, if you're relying on persistence, is if it's not persisting. And if it's not persisting in its current range, then you're essentially saying it has to be endangered throughout all its range. Yeah. You know, the words here are imprecise, and I understand the difficulty the court had in defenders and so on, but so let me do it in a sort of a concrete way. Let's assume that we have a lizard. Maybe it looks like this one. Maybe it doesn't. And in its original range, it was in all the dry territory as soon as you get east of the Sierra Nevada. So it's in California. It's in Nevada. It's in Arizona. And then let's say that we get some serious population around Las Vegas. We get Reno. We get some other areas. And so for certain parts of its range, that lizard is simply gone. But for, you know, 85% of the prior range, it's there and persists. Now, it's gone in a certain percentage of the range. Therefore, what, under your theory of how this statute works? Well, under this court's prior ruling, if you rely on what's left... When you say what's left, you're talking about the range? Correct. Go ahead. When you rely on what's left, you are essentially ignoring what's gone. Because your whole analysis is not looking at what's gone. It's only considering what's left. But I've tried to decide significant. The question is... I recognize that significant is a vague and ambiguous term. And it's up to the agencies to decide. But what I'm trying to figure out is whether you're telling us that whenever some part of the prior range is gone, you have to list. Oh, no. Absolutely not. And I know the government has tried and tried and tried. Okay. As various courts and agencies... So we're to that point. Okay. So we know some part of the prior range is gone. That's what they say. That's what the agency says in 2006. Right. But the agency also says that in the remaining range, it is persisting. And in our view, it's in no danger of extinction in the remaining range. And therefore... The problem with that analysis is that it focuses on, I suppose, only what's remaining. And it writes off what's left. And that in and of itself would require the agency to determine that what remains is only going to warrant listing if it's not persisting in that remaining range. But there's some danger that it might not persist. Correct. And I think there's several district courts that we cited in our briefs that kind of talk about various things like core habitat, core populations in its remaining range to summarily reject the notion that lost range could ever warrant in and of itself listing the species. Now, we're not saying that it must, but it has to be looked at independently of what remains in order to do the proper analysis. I wonder if I could ask you what's troubled me about the case. It seems to be agreed that there was no accurate determination of the population of the lizard. We don't know what the starting point was. So how can one use the word persistent? There's nothing we don't know what the numbers were supposed to persist. I agree, Your Honor. And I know we made that argument in at least two different contexts in our study in 1998 to determine what is viable population for the lizard. And that's But which way does it cut? You can't show it's not persisting. It's one of those sort of a mystery. What's it going to be? Well, it's important here to recall that the agency concluded that lost range is not significant because the lizard is persistent. So that's arbitrary. But won't it be equally arbitrary to say they're not persistent because you don't know what the number is? Well, a couple of points. One is the issue, I guess, at bottom doesn't cut either way, correct? And so the standard in the statute is the agency must use the best available science. And when it comes to best available science, the evidence in the record and supported in the statute is that the agency must use the best available science. The other issue in the agency's analysis is that there is a myriad of habitat threats, specifically the big threat that's highlighted in our briefs is threats from off-road vehicles. And the off-road vehicle analysis in the record talks about habitat loss from off-road vehicles, increased recreation, off-road vehicle use and border patrol use, and the impact of the status of the species in terms of presence. Mr. Levine, can you stick with Judge Newman's question for a while? In other words, was the best available science used in trying to determine what the population is? Yes, Your Honor. But the fact is... And then, in spite of that, the answer is we don't know what the population is. Is that right? Correct. So what does that mean? It means the idea that population trends or status or data is somehow supportive of the agency's decision is just plain wrong. It doesn't support any conclusion or finding. But it doesn't support your position either, does it? Well, but our position in this case is not so much that the lizard must be listed or warrants listing, but that the agency's conclusions are not supported. And the agency's conclusions... Then what should we do? Should we send it back to the agency that says you have to do A, B, and C? Correct, Your Honor. Okay. What are A, B, and C? I mean, you know, do a better count? No, Your Honor. It would be to apply the five listing standards or listing factors in Section 4, apply the best available science at the time of the decision, apply the significant portion of range listing standards, yeah, and I don't think it's at the same time. I don't want to sort of just say, ah, gotcha. That's not our case either, because we had four peer reviewers that all found that the lizard warranted a listing. Wait a minute. You said that in your brief. Right. And who were those people? I'm tapping my memory. I'm on page 16 of your brief. Correct. All agreed the lizard warranted a listing. Correct. So one of them is Pianca. Yes. Pianca. Burroughs. One of them is Witt. Yes. Bick. One of them is Barrows. He's the guy who's an expert on Coachella Valley. Correct. He talks about Coachella Valley about three pages, but he doesn't say one way or the other. And the last one is Young. Young. Correct. And what's Young say? Young says about the pertinent question in this case, which is, is the lizard endangering a significant portion of range? He says yes. Unequivocally, he says yes. Let me say, I'm now reading from your brief, the four peer reviewers whose review reflects the best available science all agreed the lizard warranted an ESA listing. Correct. Let me read to you from Mr. Young's letter. In my opinion, the designated management areas and the current protective measures are adequate, and the species does not merit federal listing as threatened or endangered. I think it's just flatly contrary to what you just represented in your brief. I appreciate that, and I would just suggest that I'm not trying to, or asking. I'm trying not to misrepresent at all what he's saying. There's a quote on the, I believe on the last page on the very top, where he's posed the question, or he proffers the question of whether or not the species is endangering a significant portion of range. And he says, quote, yes, it is. But the question that you, the question is in front of the agency, and the statement you made was whether or not it warranted listing. And the passage I just read to you from the second paragraph of the letter, he specifically says it does not warrant listing, and he underlines it. Well. Your brief is just wrong. Okay, Your Honor. I think that the. Okay, Your Honor. I would say I'm sorry. Won't you apologize for that misstatement? I apologize, Your Honor. I think, however, that. My mother says you have to mean it. I mean it, but I have a reason for why I said that, and I know what it said, and I appreciate that the government suggested otherwise, and you are as well. I didn't suggest it. I stated it, and I read. I guess let me just try to defend what I said, although I think I'm running out of time and I'm missing a lot of my main points. But the point is that when Profford, the actual question of whether or not the lizard is endangering a significant portion of range, he said, yes, it is. Recognizing he didn't want the lizard listed because he wanted to see this management strategy put into place and work. So that is perhaps the confusion, and I appreciate that the court believes that I made a mistake, and I apologize for that. Moving on to this management strategy, if I may, or maybe I should just save my last two minutes. Why don't we just say we'll let the other side, and then you'll have something to respond to. Okay. Thank you, Your Honor. Now, before the government attorney stands up, I'll do the same that Judge Noonan did. I think you may already be aware of this. Mr. Sankar was my law clerk some years ago, but it will have no effect on my decision, and actually I try to be harder on my law clerks than anybody else. May it please the Court, Sam Sankar for the government, but I gather most of you already know that. I think this Court has a pretty good grasp on the factual issues already in the case. Judge Noonan and Judge Tashima have already pointed out that this is a case where there is scientific evidence out there. It's inconclusive at best, and this is the paradigmatic situation in which the agency has to have some deference. Otherwise, a lawsuit from the other side might result in the opposite decision, and the agency would be whipsawed between competing interpretations of the record. That can't be the way that we do these cases. There's a certain amount of deference that's necessary, and that deference adequately covers the situation we have here. I do want to talk briefly about the historical range issue, which I think was highlighted in the briefs but not discussed much during the plaintiff's argument. As our brief explains, we don't read the defender's opinion to have required the work that the agency did in 2006. The Endangered Species Act defines an endangered species as one which is in, quote, danger of extinction throughout all or a significant portion. In other words, that argument is basically relying on the letter of the solicitor of March 16th, 2007? No, Your Honor. The solicitor's letter almost verbatim. I'm sorry, say that again. Acts it very closely. It sure does. And in some situations, if we were claiming Chevron deference in this particular case for that interpretation, that would be, you know, I would say, yeah, we're relying on the letter. I provided that letter in the record to show that the agency has been considering this and thinking about this in the time since it issued its 2006. Do you claim any deference in this case for this letter? Yeah, we claim need deference or skid more deference, the sort of deference where you look at the agency's considered views, you look at the reasoning that it employed in doing that, and the court, if it considers those things persuasive. This letter looks an awful lot like a brief to me. That is to say it takes dead aim at defenders and says we think defenders is wrong. Well, with due respect, first of all, I don't think defenders actually says. I think the letter may overstate what defenders said. And with due respect to the solicitor, I think the reason for that is because of the opinion in this case and the opinions in some other cases that have also read defenders that way. But as I suggested in the brief, I don't think that anything in defenders requires an analysis of the historical range. More importantly, that kind of analysis doesn't honor the text of the statute, and it doesn't make much sense, to tell you the truth, because what Judge Berzon was saying in that opinion is, look, I read this significant portion of the range, portion of the definition, to allow the service to do partial listings. Some places the animal is endangered. Some places it's not. We're going to list it here and not there. It makes no sense, I submit to Your Honor, that you would list an animal in areas where it is extinct and can't recolonize. If that were the case, we would be listing already extinct animals under the Act, and the verb tense of the Act suggests that we focus on current range and current animals. We look to see whether there are threats of those. Now, that's not to say that we don't consider historical range and losses to historical range in that evaluation. In fact, quite the opposite. Section 1533A1 of the Act requires an analysis of curtailment and dangers to the range, and in that analysis, the service looks at losses to the range and sees whether those losses impact the currently existing habitat. But, again, I submit it makes no sense to say, well, we've decided that the lizard is doing fine in its current range, but that its lost range is, quote, significant, and therefore we are going to list it on its lost range but not on its current range. And that seems to be the direction that the plaintiff would like to go with the defender's opinion. And, again, it neither makes sense practically, nor does it really honor the language of the statute. Moving on from the historical range issue, the significant portion of the range judgment here, I realize that the plaintiffs in their reply brief suggested that they didn't call it into question, but I do want to discuss it briefly. I think the service did exactly what it was supposed to do under our reading of the defender's opinion. It went back and it said, look, we've got an area where the lizard lives. Some areas it's doing okay, and in one area, the Coachella Valley, it's not doing okay. And then it did exactly the analysis that defenders suggested. It said we're looking at the geographic extent, we're looking at the biological importance of that area, and then we're trying to make a considered judgment of whether that area is significant. In its judgment, it was not. What do we do with the problem raised by Judge Nuna and then pursued by Judge Toshima? I think both sides seem to agree that we don't know very much. This lizard is small. When approached, it tends to bury itself or stay still. And you can spend ten hours looking for a lizard, and they may or may not be there, and you didn't see any. But you don't know because they might have been there, buried under the sand. Well, I have two responses to that. Number one, I think it is difficult. I do think that if you look at the 2003 decision, there's some reference to two studies done in 2002 by Grant Wright, who was then one of the leading scientists within the government on this issue. And I don't think the government doesn't suggest that his analysis is dispositive in any way, but he says, look, we've been sampling. We do have some data that's not based on the stat counts, which we have decided don't work very well. And that data does suggest at some level that there haven't been declines in this area. Subsequent to the 2003 decision, between 2003 and 2005, there have been some additional studies that have provided some more suggestions that between 1979 and 2001 there haven't been significant declines. So that's on the factual side. But there have not been significant? There have not been significant declines. And I can give you citations to that if you'd like. And the other side is, again, the deference point. And I think the Endangered Species Act doesn't say survey all the species, and if you're not sure, you should list them. That would be one way to write the statute, but it's not the way that the statute was written. There has to be a finding. And, again, if we had gone the other way and, you know, we would be subject to suit by the industries, for example, as in the National Home Builders case. What difference does it make that this case is one in which there was an original proposal to list? So the government goes through a sequence of steps, moves it from Category 2 to Category 1, then in 93 it proposes to list, then it sits there for a while, and then we get all the stuff with which we're familiar. Does that put the government in a different position trying to withdraw the proposed listing than it would be were the question free on the table, nothing else there, a proposal to list? I think the answer is it does not make it different in this case. And the reason why I use the caveat in this case is because if the government were to have reached conclusions in 1993 that it flatly contradicted in 1997 and 2001 or in 97, 2003, or 2006, and it didn't explain its change in position factually or legally or however, then that might be a problem because it might be arbitrary and capricious. In fact, it probably would be arbitrary and capricious for the government to make one conclusion based on the evidence and then without any explanation change its conclusion. But I submit to you that nothing of that sort happened here. What has changed? I mean, I read the original proposal, the 1993, and they seem to know as little then as they know now. I'll tell you one thing that did change. One of the reasons that they listed in 1993 was, well, a couple. They were worried about some gold mining activities, they were worried about some geothermal development, and there was a study from the Yuhua Basin, I think that's how you pronounce it, that suggested that lizards were declining in that area. Now, since then, the gold mining is not being done, geothermal development has ceased, and the Yuhua study that they had looked at, they decided, look, that was based on these scat counts, and what we know now is that lizard scat disappears for all kinds of reasons and isn't really a particularly good indicator. Among other things, there's other lizards that have scats that are indistinguishable from flat-tailed horn lizards, so it's hard to be sure. But that last one doesn't work because they're not alarmed about the scat count because they can't find any. Not because they're finding too much. Fair enough, but we also know that wind and environmental conditions can remove scat from areas. If there's no further questions, your Honor. Thank you, Your Honor. The problem with population declines with endangered species is that it varies with species. Some species are easy to track, bears. Some are not, lizards. The Act actually does not even identify population decline status as a factor. Now, we can debate whether or not it's realistic to totally ignore it or not, but I think there's a reason why, and that is some species are just hard to find, and that's why the Act talks about habitat loss, threats to habitat, curtailment of range in the first listing factor. And even the service in this case did a couple things that were interesting. There's some quotes in our briefs that talk about how the service admitted, we can't base a finding one way or the other on population declines. And, in fact, if you look at the assessment of the Coachella Valley population, they found that it was endangered. It didn't list for the Fish and Wildlife Service in the 2003 rule. They found that that population was endangered but didn't qualify as a DPS. But the fact is, as I said, that that population is in trouble, and there was no evidence of population declines. They looked at habitat loss and ongoing threats to the species. Even in the proposed rule, at the very beginning of the proposed rule, the agency says we anticipate widespread population declines because of widespread habitat loss. So there's this assumption that goes with impacts to habitat for species where we can't know the population. We know that that's a reason in many cases to list species. The issue of lost range, I think we made it pretty clear in our briefs that we believe that the agency waived this argument. But the question that's really posed by the argument is whether or not we can just totally disregard it every time lost habitat range. And that just is so counterintuitive of what the Act acknowledges is the primary reason for listing species, which is habitat loss. And as it was pointed out by opposing counsel, in one of the listing factors in Section 4A1, it talks about the present curtailment of range. And the agency, when they did do the analysis of lost habitat in the 2006 rule, expressly say that it's based on this factor that we're analyzing lost habitat. Maybe this question is neither here nor there. Just a matter of curiosity. But the habitat loss in this case, most of it is a longstanding duration. It was lost a long time ago. It's not going to be reversed. It's been over. It's hard to tell whether there's been a population decline. These certain threats at one time seems to have diminished. And then there are these sort of voluntary measures that are being taken in certain places. Right. To to help preserve the species. But so it's hard to tell what's going on with this lizard. Now, in light of that fact, we really don't know whether this is threatened. What is the philosophy of the plaintiffs here as to why? I mean, why are you bringing the suit? Why are you here? You're worried that what, at some point in the future it might become threatened? You all know it's threatened now, right? Well, I guess I respectfully disagree that that's the plaintiff's position. The plaintiff's position is that when you couple approximately 50 percent of habitat loss with the status and threats to the species in its remaining range, which it's generally acknowledged throughout the record that there are threats, urban sprawl, converting to ag, ORV usage, all those are going on pretty much everywhere else. And the only response to the agency as to why those threats do not warrant a listing is because of the management strategy. That's the voluntary management strategy that's in place. And the admissions in the record are startling in that the agency just weeks before the decision said, we don't think it's protecting the species. We don't think the management areas are prohibiting off-road vehicle activities. The record is replete with evidence noting that we got unauthorized ORV use throughout the area. We have no way of enforcing it. We don't have enough money to enforce it. Border patrol usage, they didn't even sign on to the strategy. They're not subject to the strategy. On off-road vehicles, and I realize we're taking over at the near time for which I apologize, Mr. Grant's master's thesis submitted in the fall of 2005, where I'll summarize it crudely, he says you run over these darn things and they don't die. He says it in fancier words, but that's what he says. I saw that. So what am I to do with off-road vehicles given that he says that? I think that that was not necessarily the entirety of, it may have been the entirety of his findings, but that's not the entirety of the evidence, certainly, and especially on paved roads where they sort of don't use the compaction. He was out on that. He was off-road. So he was talking about, and during hibernation where they tend to burrow a little further. But he also has an interesting statement in there where he acknowledges about his findings are sort of inconclusive about the effects on population declining, because he also found that lizards don't necessarily go where, like he wasn't finding any lizards where there's open ORV areas. Okay. Right. I don't know. Thank you very much. Thank both sides for their argument. The case of Tucson Herpetological Society versus Kempthorne is now submitted for decision, and we are in adjournment. Thank you very much.
judges: Noonan, Tashima, Fletcher